IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
UNITED STATES OF AMERICA,       :        Criminal Action
                                :
              Plaintiff,        :        Nos.  2:14-cr-00110
                                :              2:14-cr-00111
v.                              :
                                :        Date:  July 16, 2014
STEPHEN B. HERNDON and          :
SCOTT E. ELLIS,                 :
                                :
              Defendants.       :
_____x
```

TRANSCRIPT OF PLEA HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA MEREDITH GEORGE THOMAS
                           U.S. Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713

For the Defendants:        J. TIMOTHY DIPIERO, ESQ.
                           DiTrapano Barrett & DiPiero
                           604 Virginia Street East
                           Charleston, WV 25301

Probation Officer:         Michele Jones

Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PROCEEDINGS had before The Honorable Thomas E. Johnston,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on July 16, 2014, at

4    10:04 a.m., as follows:

5          COURTROOM DEPUTY CLERK:  The matter before the Court is

6    the United States of America versus Stephen Herndon, criminal

7    action number 2:14-cr-00110, and the United States v. Scott

8    Ellis, criminal action number 2:14-cr-00111, scheduled for plea

9    hearings.

10          THE COURT:  Good morning.  Will counsel please note

11    their appearances?

12          MS. THOMAS:  Meredith George Thomas on behalf of United

13    States.

14          MR. DIPIERO:  Tim DePiero, Your Honor, on behalf of Mr.

15    Herndon, and on behalf of Mr. Ellis, who are both present.

16          THE COURT:  Good morning.  Before we get started, I

17    think that, as I've considered it, and I think my law clerk has

18    talked with you all about this, it might make some sense, since

19    these charges are so similar and these colloquies will be so

20    similar, that we just do these two plea hearings together.

21      Now, I hadn't really -- that little brainstorm happened just

22    a few minutes ago for me, so I hadn't prepared to do that way, so

23    this might be a little funky, but we'll make our way through it.

24    I think it will save some time and, yet, allow us to have a full

25    plea colloquy.

1      MR. DIPIERO:  We certainly have no objection, Your

2  Honor.

3      THE COURT:  All right.  Very well.

4      Well, all right.  I will now ask each of the defendants to

5  stand and I will ask the deputy clerk to administer an oath to

6  each of you.

7      COURTROOM DEPUTY CLERK:  Please raise your right hands.

8      **STEPHEN HERNDON & SCOTT ELLIS, DEFENDANTS, SWORN**

9      THE COURT:  All right.  You may be seated.

10     Since we're going to do this together, each one of you will

11  have to answer verbally one at a time to each question.  All

12  right?

13     Do you both understand that you are now --

14     COURTROOM DEPUTY CLERK:  She needs to know which

15  defendant is which.

16     THE COURT:  Oh, I'm sorry.  The one on the left, on

17  your left, is Mr. Herndon, and the one on your right is Mr.

18  Ellis,

19     MR. DIPIERO:  We'll have Mr. Herndon answer first just

20  to keep it consistent.

21     THE COURT:  That's a good idea.  All right. Just for

22  the record, we're make making sure that the court reporter knows

23  which defendant is which.

24     All right.  Do you both understand that you are now under

25  oath and you must tell the truth and, if you testify falsely, you

may face prosecution for perjury or for making a false statement?

DEFENDANT HERNDON: Yes, sir, Your Honor.

DEFENDANT ELLIS: Yes, sir.

THE COURT: All right. Throughout the course of this hearing, I am going to be asking both of you a number of questions and I want to make sure that we are communicating clearly. So, if at any time I ask a question that you don't understand or anything else that occurs in this hearing that you don't understand, I want you to feel free to speak up and seek clarification.

Also, if at any time you need to confer with your attorney, I'll be pleased to pause the proceedings to allow you to do so. Do you understand all that?

DEFENDANT HERNDON: Yes, sir, Your Honor.

DEFENDANT ELLIS: Yes, sir.

THE COURT: All right. Let me begin then by -- Mr. DiPiero, let's talk about the conflict issue.

For both of you, I want you to understand that, in this criminal proceeding, you have the right to the effective representation of counsel, which includes the right to have separate counsel from other defendants who have related cases.

Now, Mr. DiPiero and I have had a couple of conversations about this already. I know what he's going to say this morning, but we need to make a record on that. So I'm going to now ask Mr. DiPiero to place on the record the facts and circumstances

regarding his representation of the two of you and, also, two other individuals who are charged in related cases.

I take it there's no reason for us do this in chambers, Mr. DiPiero?

MR. DIPIERO:  No, Your Honor.

THE COURT:  All right.  So I want both of you to listen very carefully to this, to what Mr. DiPiero will say, and also, to any discussion that I have with him afterward, and then I'll probably have some more questions for the two of you after that.

MR. DIPIERO:  Your Honor, as I've stated before, our firm was representing Alvis Porter in relationship to a -- regarding a couple of civil matters and he learned that the -- a federal grand jury had issued subpoenas for his bank records and so he asked me to represent him in connection with whatever investigation was going on.

A couple of months later, I got a call from Gary Roeher, who I've known for 15 years, and we've been friendly over that 15 years, and he said that federal agents had come to see him about problems with Arch Coal and his relationship with Arch Coal and wanted me to represent him.

I told him that I represented Alvis Porter and I'd have to check with Alvis, and I asked him, I said, "Do you have any conflict with Dallas", and he said, "We've known each other forever, but we really -- our businesses really do not relate. So we really have -- there was nothing really involved with Alvis

and vice versa.  I checked with Mr. Potter and he said the same.

When I called him back, he said that his partner, Steve Herndon, wanted me to represent him as well because he'd been wanting to come to talk to the Feds ever since he heard there was an investigation and he wanted to come and cooperate.  That's what Gary wanted to do, just wanted to come and tell the truth right away.  And so I had to recheck with Steve and I had to check with -- of course, I knew they had the same information, but I also knew that they were going to be cooperating and telling -- telling truth about what had occurred, but I had to check with Mr. Porter, and I did that and, of course, checked in each instance with Thomas Ryan to see what he thought.

Mr. Ryan was okay.  There was some discussions about it.  We went back and forth and we determined this would be okay.

Unbeknownst to me at the time, was that Mr. Herndon had another partner, business partner, Mr. Scott Ellis, and this is the one that's really kind of unusual because I didn't really expect to be involved with Mr. Ellis.  Just by pure bad luck, if nothing else, Mr. Ellis was out of town at the time that the Feds came to see him.

This all happened -- Judge, I'm serious.  This happened -- I got a call Friday afternoon and the entire day Sunday, we were in my office, first with Mr. Herndon and Mr. Roeher for several hours, and then with several -- a couple of attorneys and several agents, and so we were there a total of 12 hours trying to figure

this thing all out.

And, at the end of that, you know, Mr. Herndon said, you know, "I'm sure that Mr. Ellis is going to want to tell the truth and cooperate," and they said, "Well, don't talk to him. We've already got him planned to come in the next day," and so I wouldn't have planned to talk to him because I didn't anticipate representing him, but Mr. Herndon said, "Okay, I won't" and, sure enough, Mr. Ellis came from Logan, met with the federal folks here, and told the exact same truth. They were very pleased and very impressed because they knew that Mr. Herndon and him had not spoken. They had not, you know, got their stories straight and so he came in on his own without an attorney and just told the truth.

And, in fairness to Mr. Ellis, I don't think he had any concept that he could be -- he was going to be prosecuted. I just think he was just coming up to tell his story and, in that regard, Judge, I haven't gone over this. Maybe this is an appropriate time.

I think it's important for the Court to understand that this was -- you know, what we were talking about was a little bit unusual for the Feds bar, I think, in the sense that vendors have been prosecuted who have stolen, who have abused the system and made money of it to abuse their false billing, and things of that sort, as the Court and I are aware of a specific case in that regard, but this was unusual for some of these guys who have --

who weren't really false billing.  They were just simply being
extorted money.  It's called kickback.

But in fact, we believe it's more -- just simply, "If you
want to stay, this is what you've got to do," and they could have
-- obviously could have said no, but in terms of trying to
fashion out what -- what was appropriate and wasn't appropriate
for a plea, and the federal folks were -- the government was very
fair to us in terms of trying to figure this out because what, in
effect, I was looking at as a defense attorney was, could I
defend the aiding and abetting of dishonest services, which is
basically what their fraud case would have been against the folks
with Arch, and that's kind of a strange, strange setup.

But if -- you know, for instance, Mr. Porter was on the --
had 40-some employees and owed personally $4 or $5 million
dollars on equipment when he was approached to say, "If you want
to stay, you've got to pay," and so, what I just want to say is,
that we then started looking at the structuring issues because --
and that was difficult to explain to these folks because
structuring laws change.  It used to be, it was "knowing and
willful," but "willful" has been taken out.  You don't have to
know that you're committing a crime.  You just have to know
you're trying to avoid the reporting requirement.

And that's what happened in this case.  They knew they would
cash checks or get cash for under $10,000.00 to avoid the
reporting requirements, and so that's how we came in.

1        But to finish up on this waiver, I get a call from the

2    federal government from -- I think it was Mr. Ryan, it could have

3    Mr. Ryan, but someone over here said, "Mr. Ellis is going to need

4    an attorney.  We've got to figure out something for him.  He's

5    told the exact truth.  We don't see any possible problems between

6    him and the other folks," and so they literally just sent him

7    over to my office and they told him where to find me and, for the

8    first time, we met in my office like that.  It was kind of

9    unusual.

10       And, so, I had to call Mr. Porter, and then I had to call

11   Mr. Roeher and Mr. Herndon and make sure they were okay and then

12   I prepared, at various times, these waivers that the Court has

13   seen, which are each side, and while, you know, there could be

14   potential conflicts, I really don't envision any of them stepping

15   up and saying, "So-and-so has lied about this or that."  I just

16   -- they pretty much -- and have that come up at sentencing.

17   They've all four cooperated.

18       And so, of course, Mr. Roeher and Mr. Herndon have business

19   association; and Mr. Herndon and Mr. Ellis have business

20   association; but, basically just telling -- telling what they

21   know and from my -- to my knowledge, the government has been very

22   pleased with their cooperation.

23            THE COURT:  Does the government agree that there's no

24   conflict of interest for Mr. DiPiero and no apparent potential

25   conflicts of interest?

1    MS. THOMAS:  The United States agrees that there has

2  been a waiver of any conflict of interest that could arise and

3  doesn't foresee any conflict of interest arising between now and

4  sentencing in regard to these issues.

5    THE COURT:  All right.  Well, Mr. Herndon and Mr.

6  Ellis, did you all listen to this discussion that we just had?

7    DEFENDANT HERNDON:  Yes, sir, Your Honor.

8    DEFENDANT ELLIS:  Yes, Your Honor.

9    THE COURT:  Did you understand all of it?

10    DEFENDANT HERNDON:  Yes, Your Honor.

11    DEFENDANT ELLIS:  Yes, Your Honor.

12    THE COURT:  All right.  Well, the -- I just want to

13  explain a little further that there is a danger to having a

14  lawyer who also is representing someone else in a closely related

15  case and the danger is that the attorneys -- your attorney has a

16  duty to be entirely loyal to you, in his representation of you,

17  and when he's representing someone else, there's at least

18  theoretically the possibility that if he's representing someone

19  else in a related case, that -- who he also has an obligation to

20  be loyal to, including, we could be talking about the two of you,

21  that that -- that those loyalties could come into conflict.

22    Now, I know less about this case at this point than you

23  probably think that I do.  Your lawyer, you, and the government

24  know a lot about this case.  I don't know much about it at all,

25  at this point, so I'm in the worst position to size up whether or

not there's a potential for conflict of interest here.  So -- and
so, at this point, I have to, to some extent, rely upon
representations made to me.

     To me, in a situation where there's a guilty plea, the most
obvious area where there could be a potential conflict of
interest is sentencing.  If an issue comes up at sentencing, just
as an example, for example, Mr. Herndon's sentencing, and if an
issue comes up that may not have been anticipated at this point,
that the government needs Mr. Ellis's testimony to resolve an
issue at sentencing.  Then Mr. DiPiero would be put in the
position where the government would call Mr. Ellis and Mr.
DiPiero would have to cross examine his own client and that's not
really a possibility under the law and, at that point, you both
would probably have to get a new lawyer and that's just sort of a
-- the tip of iceberg of the potential problems, but again,
that's just my imagining the possibilities and I don't know the
case nearly as well as you all do.

     Has your attorney talked this all out with both of you?

          DEFENDANT HERNDON:  Yes, sir, Your Honor.

          DEFENDANT ELLIS:  Yes, Your Honor.

          THE COURT:  Let me just do something, too.  I
appreciate the indications of respect, but it will just speed
things along if each of you just say yes or no.  I appreciate the
sentiment, but it will make things quicker if you just say yes or
no.

1    Has he answered any questions that you have about this

2  conflict, this potential conflict of interest, issue?

3          DEFENDANT HERNDON:  Yes.

4          DEFENDANT ELLIS:  Yes.

5          THE COURT:  And he -- I have been provided with waivers

6  of conflict of interest for each you.  They are part of the

7  record.  Well, for this proceeding, I will order that it be made

8  a part of the record again.  Have you -- and they are both

9  partially typewritten and partially handwritten.

10     Actually, I ought to take a moment and read these because

11 they appear to be different.  I actually think I read Mr.

12 Herndon's the other day in connection with Mr. Roeher's hearing.

13 Let me just take a quick moment and read through Mr. Ellis's.

14     (Pause)

15         THE COURT:  All right.  So you each were provided with

16 this conflict of interest form.  Have you read that form?

17         DEFENDANT HERNDON:  Yes.

18         DEFENDANT ELLIS:  Yes.

19         THE COURT:  And you've obviously signed it.  Do you

20 understand everything in the form?

21         DEFENDANT  HERNDON:  Yes.

22         DEFENDANT ELLIS:  Yes.

23         THE COURT:  Did you -- did your attorney explain the

24 form to you in detail?

25         DEFENDANT HERNDON:  Yes.

| | |
|---|---|
| 1 | DEFENDANT ELLIS:  Yes. |
| 2 | THE COURT:  Did he answer any of questions that you've |
| 3 | had about these forms? |
| 4 | DEFENDANT HERNDON:  Yes. |
| 5 | DEFENDANT ELLIS:  Yes. |
| 6 | THE COURT:  All right.  Notwithstanding then your |
| 7 | attorney's representation of these other persons, do you want |
| 8 | your attorney to continue to represent you in this case? |
| 9 | DEFENDANT HERNDON:  Yes. |
| 10 | DEFENDANT ELLIS:  Yes. |
| 11 | THE COURT:  Do you understand that if you don't want |
| 12 | Mr. DiPiero to continue to represent you, that the Court will |
| 13 | continue this matter to allow you the time and opportunity to |
| 14 | retain your own independent counsel? |
| 15 | DEFENDANT HERNDON:  Yes. |
| 16 | DEFENDANT ELLIS:  Yes. |
| 17 | THE COURT:  And do you understand that -- and knowing |
| 18 | that, would you still like to proceed with Mr. DiPiero as your |
| 19 | attorney? |
| 20 | DEFENDANT HERNDON:  Yes. |
| 21 | DEFENDANT ELLIS:  Yes. |
| 22 | THE COURT:  All right.  Any other inquiry that either |
| 23 | side believes I should make with regard to this? |
| 24 | MS. THOMAS:   No, Your Honor |
| 25 | MR. DIPIERO:  No, Your Honor. |

THE COURT: All right. I will go ahead and order that these two forms be filed in connection with this proceeding and we will go ahead and move forward.

Now, with regard to the next part of the plea hearing, I think I'm going to have the competency -- or colloquy, I think I'm going to have to do those individually.

So, Mr. Herndon, after all this, let me begin by asking you, how old are you?

DEFENDANT HERNDON: 37, Your Honor.

THE COURT: And can you brief describe your educational background?

DEFENDANT HERNDON: Yes. Graduated in '95 from Logan High School, and then graduated from Glenville State in 2000 with an Environmental Technology degree, and then, I think it was 2005, I got my bachelor's degree from Marshall.

THE COURT: And, for the record, can you read and write and understand the English language?

DEFENDANT HERNDON: Yes, sir.

THE COURT: Have you taken any medicine or drugs or consumed any alcoholic beverages within the last 24 hours?

DEFENDANT HERNDON: No.

THE COURT: Including prescription drugs?

DEFENDANT HERNDON: No.

THE COURT: All right. Have you ever been treated for any mental illness or addiction to drugs of any kind?

1          DEFENDANT HERNDON:  No.

2          THE COURT:  Do you know where you are and why you are

3     here today?

4          DEFENDANT HERNDON:  Yes, sir.

5          THE COURT:  Do you have any hearing impairment or other

6     disability which would prevent you from fully participating in

7     this hearing today?

8          DEFENDANT HERNDON:  Yes.

9          THE COURT:  Mr. DiPiero, do you have any reason to

10    question of competence of Mr. Herndon?

11         MR. DIPIERO:  Absolutely not.

12         THE COURT:  All right.  Mr. Ellis, how old are you?

13         DEFENDANT ELLIS:  I'm 44.

14         THE COURT:  And can you briefly describe your

15    educational background?

16         DEFENDANT ELLIS:  Graduated Logan High School 1987.

17         THE COURT:  All right.  And can you read and write and

18    understand the English language?

19         DEFENDANT ELLIS:  Yes.

20         THE COURT:  Can you briefly describe your work

21    experience?

22         DEFENDANT ELLIS:  After I graduated high school, I

23    started to work for my mother and father.

24         THE COURT:  All right.  What have you generally done

25    throughout your career?

                    DEFENDANT ELLIS:  Welded, machine work, fabrication.

Machine shop work.

                    THE COURT:  Including owning a business?

                    DEFENDANT ELLIS:  Yes.

                    THE COURT:  Mr. Herndon, I don't think I asked you that

question.  Can you briefly describe your work experience?

                    DEFENDANT HERNDON:  Yes, sir.  It's always been coal

mining related.  I started with an engineering firm around 2000

and then went directly to the mines about in 2001 as a contractor

and, in 2002, hired on with the company as a mine clerk.  I think

it was 2006, I moved to warehouse manager, and then, in 2011,

went into business with Mr. Ellis, and then, in 2012, started

another business with Mr. Roeher.

                    THE COURT:  All right.  Mr. Ellis, have you taken any

medicine or drugs or consumed any alcoholic beverages within the

last 24 hours?

                    DEFENDANT ELLIS:  No.

                    THE COURT:  Including prescription drugs?

                    DEFENDANT ELLIS:  No.

                    THE COURT:  Have you ever been treated for any mental

illness or addiction to drugs of any kind?

                    DEFENDANT ELLIS:  No.

                    THE COURT:  And do you know where you are and why you

are here today?

                    DEFENDANT ELLIS:  Yes.

1        THE COURT:  And do you have any hearing impairment or

2  other disability which would prevent you from fully participating

3  in this hearing today?

4        DEFENDANT ELLIS:  No.

5        THE COURT:  Actually, I think I forgot to ask you, Mr.

6  Herndon, another question, and that is, do you know where you are

7  and why you're here today?

8        DEFENDANT HERNDON:  Yes, sir.

9        THE COURT:  All right.  Mr. DiPiero, do you have any

10  reason to question the competence Mr. Ellis?

11        MR. DIPIERO:  Not at all.

12        THE COURT:  All right.  The originals of the plea

13  agreements, I believe, have been tendered to the Court.

14    Ms. Thomas, are these the same copies that I would have

15  received in advance of the plea hearing?

16        MS. THOMAS:  Yes, Your Honor.  There haven't been any

17  changes made.

18        THE COURT:  All right.  Very well.  I think we can go

19  back to -- I think I can go back to asking the questions together

20  now.

21    For both defendants, are those your signatures which appear

22  on the final pages of the plea agreement?  In Mr. Herndon's case,

23  it's Page 9.  In Mr. Ellis's case, it's also Page 9.

24        DEFENDANT HERNDON:  Yes.

25        DEFENDANT ELLIS:  Yes.

1          THE COURT:  And are those your initials that appear on

2     the other pages of the plea agreement?

3          DEFENDANT HERNDON:  Yes.

4          DEFENDANT ELLIS:  Yes.

5          THE COURT:  And there's a numbering error in, I

6     believe, it's Mr. Herndon's plea agreement.  There's no Paragraph

7     13, but they both have 16 paragraphs.  So, have each of you read

8     and reviewed with your attorney each of the 16 paragraphs of the

9     plea agreement and the exhibits attached to the plea agreement?

10          MR. HERNDON:  Yes.

11          MR. ELLIS:  Yes.

12          THE COURT:  And do you wish to have the various terms

13     of the plea agreement orally stated on the record today or do you

14     believe that that is unnecessary?

15          MR. HERNDON:  I think it's unnecessary, Your Honor.

16          MR. ELLIS:  Unnecessary.

17          THE COURT:  All right.  And, Mr. DiPiero, have you

18     reviewed each of the 16 paragraphs of these plea agreements and

19     their exhibits with your clients?

20          MR. DIPIERO:  I have with each of them, Your Honor,

21     separately.

22          THE COURT:  All right.  And Mr. DiPiero and Ms. Thomas,

23     is there any reason why either of you believe that the various

24     terms of these plea agreements should be orally stated on the

25     record?

1          MS. THOMAS:   No, Your Honor.

2          MR. DIPIERO:  No, Your Honor.

3          THE COURT:  All right.  Very well.  Then, from what I

4     can tell, these plea agreements are very, very similar, so I'm

5     going to try to go ahead and go through them together.  There are

6     certain provisions that I need to go over with you in these plea

7     agreements, starting with the section that is entitled

8     "Forfeiture".  That begins on Page 2 and runs over onto Page 3 in

9     both plea agreements.

10         Now, in Mr. Herndon's plea agreement, it indicates that Mr.

11     Herndon has agreed to forfeit to the United States $132,000.00

12     and, in Mr. Ellis's plea agreement, it indicates that he has

13     agreed to forfeit to the United States $215,355.85.  Is it your

14     understanding that you have agreed to forfeit those amounts?

15         DEFENDANT HERNDON:  Yes, sir.

16         DEFENDANT ELLIS:  Yes.

17         THE COURT:  All right.  Now, in addition to that, on --

18     I want to talk about subsection (g) of Section 5.  Now, in order

19     to do that, I need to make one thing clear with you.  Do you all

20     understand that a "waiver" is a legal term which means you're

21     giving something up?

22         DEFENDANT HERNDON:  Yes.

23         DEFENDANT ELLIS:  Yes.

24         THE COURT:  All right.  So, then in Subsection (g) of

25     Section 5, which is on Page 3ion each your plea agreements, do

you understand that you waive any defense that you may have to these forfeiture proceedings?

DEFENDANT HERNDON: Yes.

DEFENDANT ELLIS: Yes.

MR. DIPIERO: Your Honor, if I could, I'd just like to state for the record that on a previous date, Mr. Herndon has paid $132,000.00 and sent to the IRS and, similarly, Mr. Ellis has paid $215,355.85 and has sent that onto the IRS, as well.

THE COURT: All right. Are there receipts that you want to put in the record for that?

MR. DIPIERO: I can.

THE COURT: Well, you don't have do it now, but we'll just note it for the record and we can do it after the hearing.

MR. DIPIERO: Thank you.

THE COURT: You can provide it to the courtroom deputy after the hearing. I told you this is going to be a little bit clunky because I don't usually do these things together and I missed a pretty important question early on, back when we were talking about the plea agreement at the beginning.

Do each of you -- this is an important question. Do each of you understand and agree with all of the terms and provisions contained in the plea agreement?

DEFENDANT HERNDON: Yes.

DEFENDANT ELLIS: Yes.

THE COURT: All right. Let's go back now to the

specific -- some of the specific provisions of the plea
agreement.  I think that brings us to Section 10 which, in both
agreements, I believe, starts on Page 4 and runs over onto Page
5.

Now that section is entitled "Stipulation of Facts and
Wavier of Federal Rules of Evidence 410" and I want to -- I want
to begin with the Stipulation of Facts, which is attached to each
agreement as Exhibit B.  I want to turn your attention to those
respective documents with each of your agreements.

For Mr. Herndon, that is a three-page document.  For Mr. --
oh, I'm sorry.  They're both four-page documents.  So, for each
you, on the fourth page, the last page of that Stipulation of
Facts, is that your signature which appears there?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  And are those your initials that appear on
the other pages of the plea Stipulation of Facts?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  And have you each read your respective
Stipulation of Facts?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS: Yes.

THE COURT:  And do you each agree that the facts
contained in your respective stipulation are true?

1          DEFENDANT HERNDON:  Yes.

2          DEFENDANT ELLIS:  Yes.

3          THE COURT:  All right.  A little bit about what will be

4    happening from here on out.  I will be asking the probation

5    officer to prepare a Presentence Investigation Report.  That

6    report will contained detailed recommended factual findings

7    regarding this offense and your background, among other things.

8          Ultimately, at sentencing, I will make factual findings

9    based at least in part on the recommendations contained in the

10   Presentence Report and, by the way, there will be a separate

11   report for each of you.

12         Now, I want you to understand, even though you have reached

13   an agreement regarding certain facts with the government that's

14   contained in these stipulations, I want you to understand that in

15   this process, neither the probation officer, nor this Court, are

16   bound by that stipulation of facts.  Do you understand that?

17         DEFENDANT HERNDON:  Yes.

18         DEFENDANT ELLIS:  Yes.

19         THE COURT:  Do you further understand that if I make

20   findings of fact at sentencing that are different from or

21   inconsistent with the facts contained in these stipulations, you

22   will still be bound by your guilty plea and would have no right

23   to withdraw it?  Do you understand that?

24         DEFENDANT HERNDON:  Yes.

25         DEFENDANT ELLIS:  Yes.

1          THE COURT:  All right.  Now the other matter addressed

2     in Section 10 is a waiver of federal rule of 410.  Now Rule 410

3     generally provides that information or documents regarding plea

4     negotiations, and this Stipulation of Fact would fall into that

5     category, are generally not admissible at trial.  In other words,

6     the government is not allowed to use that sort of thing against

7     you at trial normally.

8        However, under this waiver, if you withdraw from the plea

9     agreement or it's no longer any good because you have violated

10    one or more of its terms and there is a subsequent trial, then

11    the government, under this waiver, would be allowed to present

12    the Stipulation of Facts in its case in chief or for other

13    purpose at that trial.  Do you understand that waiver?

14          DEFENDANT HERNDON:  Yes.

15          DEFENDANT ELLIS:  Yes.

16          THE COURT:  All right.  Next, I want to refer you to

17    Section 11 of the plea agreement, which starts on Page 5 and, for

18    Mr. Herndon, runs a little bit over onto Page 6, and it's

19    entitled "Agreement on Sentencing Guidelines."

20       Now has your attorney talked with you -- before we get in

21    this specific section, I want to ask you some specific questions

22    about the guidelines.  Has your attorney talked with you about

23    the federal sentencing guidelines and how they work generally?

24          DEFENDANT HERNDON:  Yes.

25          DEFENDANT ELLIS:  Yes.

1          THE COURT:  And has he shown you that chart in the back

2     of the book?

3          DEFENDANT HERNDON:  Yes.

4          DEFENDANT ELLIS:  Yes.

5          THE COURT:  All right.  Well, working from that chart, I

6     want to have a similar discussion with you.  If you'll recall

7     from the chart, on left side, there's a series of numbers that

8     run from low to high as you go down the page.  Those are offense

9     levels, and the offense level is calculated by starting with a

10    Base Offense Level, which is a starting point, and that can be

11    adjusted upward or downward, depending on the facts and

12    circumstances of the case to arrive at an adjusted offense level.

13         Then consideration is generally given to a reduction for

14    acceptance of responsibility.  Has your attorney talked with you

15    about that?

16         DEFENDANT HERNDON:  Yes.

17         DEFENDANT ELLIS:  Yes.

18         THE COURT:  All right.  Then, after that, you generally

19    arrive at a Total Offense Level.  Then you go up to the top of

20    the chart, and there are six criminal history categories, and you

21    would fall into one of those, depending on the number of points,

22    if any, assigned to any prior convictions that you may have.

23         Then you combine the criminal history category with the

24    Total Offense Level and arrive at a point in the chart that gives

25    a range of months of imprisonment.  Certain parts of the chart

allow certain alternatives to imprisonment.  Do you understand all that so far?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  All right.  Now, once we arrive at that guideline sentencing range, I have the authority to sentence you within that range and, in some circumstances, I would have the authority to sentence you outside of that range, either above it or below it.

If I do that based on factors identified in the guidelines, it's generally known as a "departure".  If I sentence you outside the guideline range, again, above it or below it based on factors outside of the guidelines, it's generally known as a "variance". Do you understand all of these things about the guidelines?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  Has your attorney gone over all of these things with you about the guidelines?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  All right.  Very well.  With all of that in mind then, Section 11 contains an agreement you have reached with the government regarding one or more provisions of the Federal Sentencing Guidelines.  Now, this is similar to the Stipulation of Facts in that in the Presentence Report that the probation

officer will prepare, there will be a recommended guideline

calculation.

Ultimately, at sentencing, I will make guideline findings

based at least in part on that recommendation.  So, once again,

in this process, I want to you understand that even though you

have reached an agreement with the government regarding the

guidelines, neither the probation officer, nor this Court, are

bound by that agreement.  Do you understand that?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  And do you further understand that if I

make guideline findings at sentencing that are different from or

inconsistent with this agreement on the guidelines, you will

still be bound by your guilty plea and would have no right to

withdraw it?  Do you understand that?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  All right.  Let's move on then to Section

13, which appears on Page 6 in both agreements.  Well, here's

where the number gets tricky.  It's 13 in Mr. Herndon's plea

agreement, it's 12 in Ellis's, and I think its a just a numbering

error.  There's no Paragraph 12 in Mr. Herndon's agreement.

Nonetheless, I believe that a -- they are identical in substance.

All right.  A couple of things I want to talk with you about

before we get in -- this section, although numbered differently,

1  in both plea agreements, it is entitled "Waiver of Appeal and

2  Collateral Attack".  Now this section relates to a procedures

3  that I first want to describe to you briefly.

4      An "appeal" is a procedure by which party to a case before a

5  District Court like this and, in a criminal case, it's often the

6  defendant, goes to the Court of Appeals, which is the next level

7  up of the court system, and argues that certain errors or

8  mistakes may have taken place in their criminal case before the

9  District Court.

10     A "collateral attack" is a separate civil case, sometimes

11  referred to as a "habeas corpus petition", which may be filed

12  after a defendant's criminal case is over in which the defendant

13  may also argue that certain errors or mistakes may have taken

14  place in their criminal case before the District Court.

15     Now do you understand those two procedures at least as I've

16  briefly described them to you this morning?

17          DEFENDANT HERNDON:  Yes.

18          DEFENDANT ELLIS:  Yes.

19          THE COURT:  All right.  The other matter I want to

20  mention to you before we get into this section is that there are

21  two phases to a criminal case.  The first phase is the phase in

22  which guilt or innocence is determined.  Sometimes, that's by a

23  trial; much or often, it is by a guilty plea like what we're

24  doing today.

25     That phase of the case begins at the very beginning of the

1    case and runs up to the point where that determination is made.

2         If the determination of guilt is made, then you would go to

3    the second phase of the case, which is the penalty phase in

4    which, obviously, the penalty is determined for the crime and

5    that concludes with a sentencing hearing at the end of the case.

6         Now do you both understand the two phases of a criminal case

7    as I've briefly described them?

8              DEFENDANT HERNDON:  Yes.

9              DEFENDANT ELLIS:  Yes.

10             THE COURT:  All right.  With all of that in mind then,

11   let me just take a quick look at these and make sure I'm getting

12   this right.

13        (Pause)

14             THE COURT:  All right.  In the first paragraph of this

15   section, do each you understand that you waive the right to

16   appeal your conviction and any sentence of imprisonment, fine, or

17   term of supervised release, or the manner in which the sentence

18   was determined on any ground whatsoever, with one exception, you

19   may appeal any sentence that is greater than the maximum penalty

20   set forth by statute.  Do you understand that waiver?

21             DEFENDANT HERNDON:  Yes.

22             DEFENDANT ELLIS:  Yes.

23             THE COURT:  Anything about it that you don't understand

24   or that you have questions about?

25             DEFENDANT HERNDON:  No.

1                    DEFENDANT ELLIS:  No.

2                    THE COURT:  All right.  Then, in the second paragraph

3      of this section, do you also understand that you may not file a

4      later civil proceeding, sometimes a "collateral attack" or a

5      "habeas corpus petition", challenging your plea, your conviction,

6      or your sentence?

7                    DEFENDANT HERNDON:  Yes.

8                    DEFENDANT ELLIS:  Yes.

9                    THE COURT:  And, finally, do you understand that you

10     are in no event waiving your right to claim ineffective

11     assistance of counsel either on appeal or by collateral attack?

12                   DEFENDANT HERNDON:  Yes.

13                   DEFENDANT ELLIS:  Yes.

14                   THE COURT:  All right.  Finally, I want to refer you to

15     section -- this is also on Page 6, and Mr. Herndon's agreement is

16     Paragraph 14, and Mr. Ellis's, it's Paragraph 13.  It's entitled

17     "Waiver of FOIA and Privacy Right".

18         Now this waiver means you can't go back and seek documents

19     or other information about the case from the government even with

20     a Freedom of Information Act request.  Do you understand that

21     waiver?

22                   DEFENDANT HERNDON:  Yes.

23                   DEFENDANT ELLIS:  Yes.

24                   THE COURT:  All right.  Mr. DiPiero, have you

25     thoroughly reviewed each plea agreement with each of your

1 clients?

2    MR. DIPIERO:  I have, Your Honor.

3    THE COURT:  And do you believe that each of them

4 understands the various terms and provisions of the plea

5 agreement, fully understands them, including the waivers and

6 other matters that I have gone over with each of them today?

7    MR. DIPIERO:  I do, Your Honor.

8    THE COURT:  All right.  And have each of you reviewed

9 the plea agreement in detail with your attorney?

10    DEFENDANT HERNDON:  Yes.

11    DEFENDANT ELLIS:  Yes.

12    THE COURT:  And do each of you believe that you have

13 had adequate time to discuss your case fully with your attorney?

14    DEFENDANT HERNDON:  Yes.

15    DEFENDANT ELLIS:  Yes.

16    THE COURT:  Has your -- for each of you, has your

17 lawyer answered any questions that you have had about your case?

18    DEFENDANT HERNDON:  Yes.

19    DEFENDANT ELLIS:  Yes.

20    THE COURT:  Mr. DiPiero, during your representation of

21 each defendant, has he been cooperative?

22    MR. DIPIERO:  In each case, they have been cooperative,

23 absolutely.

24    THE COURT:  All right.  For each you, has anything

25 further been agreed to, either orally, or verbally, or in

1    writing, that is not contained in the plea agreement?

2              DEFENDANT HERNDON:  No.

3              DEFENDANT ELLIS:  No.

4              THE COURT:  All right.  I will order that each plea

5    agreement be filed.

6         I will find that each defendant understands and agrees with

7    the terms contained in the plea agreement.

8         I will defer accepting or rejecting the plea agreement until

9    sentencing, after the Presentence Investigation Report has been

10   received and considered.

11        Now have each of you received and read and reviewed with

12   your attorney the information or charging document proposed in

13   this case?

14             DEFENDANT HERNDON:  Yes.

15             DEFENDANT ELLIS:  Yes.

16             THE COURT:  And do you understand the charge contained

17   in that information?

18             DEFENDANT HERNDON:  Yes.

19             DEFENDANT ELLIS:  Yes.

20             THE COURT:  Would you like me to read the information

21   to you or will you waive the reading of the information?

22             DEFENDANT HERNDON:  Waive, Your Honor.

23             DEFENDANT ELLIS:  Waive it.

24             THE COURT:  All right.  As I understand it, you will be

25   pleading guilty to a single-count information, which charges you

with structuring in violation of 31 U. S. C. Section 5324(a)(3) and 18 U. S. C. Section 2.

Now I want to just talk briefly about principal and accessory or aiding and abetting here. As I understand the facts of this transaction, probably given -- well, my reading of this is that they're both charged with aiding and abetting each other. Actually, each information charges the defendant with structuring, aided and abetted by the other. I imagine if these had been charged together, which they could have been, they would be charged with aiding and abetting each other.

But as I read the facts as to structuring, as the financial institution at issue in the information is LB&T, that probably Mr. Ellis is the principal and Mr. Herndon is the aider and abettor under these facts. I'm going to advise them as to both, but is that a fair reading of the facts?

MS. THOMAS: Let me look just one second. I believe that --

THE COURT: I mean, they're actually both charged as principals aided and abetted by the other.

MS. THOMAS: The statute allows for assisting in structuring, so I believe they both could have been charged as principals in this case, but I would need to think -- or at least that's how the charge reads. Let me look at the statute briefly. Structure or assist in structuring, if you look at Subsection (a)(3) --

1      THE COURT:  Well, you're right.  The statute does read

2  that way and, actually, as I read the informations, they're both

3  actually charged as principals, and I think that is in each of

4  the informations, as I recall.

5      MS. THOMAS:   It is.

6      THE COURT:  So do I need to even instruct them with

7  regard to the aiding and abetting section?

8      MS. THOMAS:  Out of and abundance of caution, I believe

9  that would be appropriate, as they've both been charged with

10  aiding and abetting.

11      THE COURT:  Well, actually, the way the information

12  reads is each is charged as a principal aided and abetted by the

13  other.  I mean, that's what -- I mean, for example, in Mr.

14  Herndon's, he is charged aided and abetted by Mr. Ellis and

15  exactly the opposite language appears in Mr. Ellis's.  So,

16  they're both charged -- I think a fair reading of each

17  information is that they're charged as principals.  Now that you

18  point out that language in the statute, I think you're right that

19  assisting makes you a principal in this -- on this particular

20  statute.

21      MS. THOMAS:  I think that would work.

22      THE COURT:  Is there any objection to doing it any

23  other way?  In other words, I would just -- I would just advise

24  them as principals.  I've spent more time asking this question

25  than I would have just talking about aiding and abetting.

1    MS. THOMAS:  I don't have an objection to that, seeing

2    as that's how they've been charged.

3    MR. DIPIERO:  I have no objection, Your Honor.  As a

4    practical matter, this is just one instance that was taken and

5    used for this purpose.  They were required to come up with a

6    certain amount of money and they would help each other gather

7    that money and get it paid.  So it's -- they can both be

8    principals because of the way they're charged.  I have no problem

9    with it.  They know that they helped each other to get this thing

10   accomplished.

11   THE COURT:  I understand, and I think under the

12   statute, a principal can assist in structuring, too, so I think

13   -- I think we're fine on that if nobody has any objection.

14   MS. THOMAS:  I do not, Your Honor

15   THE COURT:  All right.  Well, I've spent a lot more time

16   asking about that than I would have if I just went through the

17   discussion I normally give on aiding and abetting, but let's

18   forge on forward then.  I want to talk with you a little bit

19   about this charge and this statute, at this point.

20   31 U. S. C. 5324(A)(3) provides in pertinent part that:

21   "No person shall, for the purpose of evading the reporting

22   requirements of Section 5313(a) of Title 31 or any regulation

23   prescribed thereunder -- or under that section...structure or

24   assist in structuring, or attempt to structure or assist in

25   structuring, any transaction with one or more domestic financial

institutions."

Now, in order to establish structuring under that statute, the government would have to prove each of the following elements of that crime each beyond a reasonable doubt, and they are:

First, that you knowingly engaged in acts of structuring;

And, second, that you did so with the knowledge of a financial institution's reporting requirements;

And, third, that you acted with the intent or purpose to evade those requirements.

Now, I want to share with you some definitions that apply to what I have just told you.

"A person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under the law...'in any manner' c includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000.00 into a transaction smaller sums, including sums at or below $10,000.00, or the conduct of a transaction, or series of currency transaction at or below $10,000.00.  The transaction or transactions need not exceed the $10,000.00 reporting threshold at any single financial institution on any single day in order to constitute structuring within meaning of this definition."

1    A single transaction, therefore, can be subject to the

2    structuring statute.

3    As used here, the phrase "transaction in currency" means a

4    transaction involving the physical transfer of currency from one

5    person to another.

6    An act is done "knowingly" if done voluntarily and

7    intentionally and not because of mistake or accident or other

8    innocent reason.

9    Are there any objections to the elements as I have described

10   them?

11           MR. DIPIERO:  No, Your Honor.

12           MS. THOMAS:  No, Your Honor.

13           THE COURT:  All right.  Next, I want to go over with

14   you the maximum and any minimum penalties you may face as a

15   result of your plea, and that is a maximum term of imprisonment

16   of five years; a maximum fine of $250,000.00, or twice the gross

17   pecuniary gain or loss resulting from your conduct, whichever is

18   greater; and maximum term of supervised release of three years.

19   A mandatory special assessment of $100.00 would be required;

20   and restitution could be ordered if it were found to be

21   applicable.

22   Ms. Thomas, I don't usually inquire about this, but you look

23   like you ran across something that concerns you.

24           MS. THOMAS:   No, Your Honor.  I was just double

25   checking something.

1     THE COURT:  Okay, very well.

2  All right.  Next, I want to return to our discussion of the

3 federal sentencing guidelines.  They are advisory, meaning

4 they're not mandatory or don't have to be followed, but they'll

5 nevertheless play an important role in your case from here on

6 out.

7  This Court will consider the factors set forth in 18 U. S.

8 C. Section 3553(a), including the advisory guidelines in

9 determining the appropriate sentence in your case.

10  I now want to ask you some questions that will help me to

11 understand your understanding of the advisory guidelines.

12  Have you discussed with your attorney the various factors

13 which apply in determining what the sentence in your case may be

14 under the advisory guidelines?

15    DEFENDANT HERNDON:  Yes.

16    DEFENDANT ELLIS:  Yes.

17    THE COURT:  And do you understand that, on this

18 single-count information, you cannot in any event receive a

19 greater sentence than the statutory maximum that I explained to

20 you a few moments ago?

21    DEFENDANT HERNDON:  Yes.

22    DEFENDANT ELLIS:  Yes.

23    THE COURT:  And do you understand that the Court will

24 not determine a sentence for your case until a later date, when a

25 Presentence Investigation Report as been completed and both you

1    and the government have had an opportunity to challenge the facts

2    and analysis reported by the probation office?

3            DEFENDANT HERNDON:  Yes.

4            DEFENDANT ELLIS:  Yes.

5            THE COURT:  Do you also understand that under a concept

6    known as "relevant conduct", this Court, in determining the Total

7    Offense Level for sentencing purposes under the guidelines, may

8    take into account any conduct, circumstances or injuries relevant

9    to the crime of which you may be convicted

10           DEFENDANT HERNDON:  Yes.

11           DEFENDANT ELLIS:  Yes.

12           THE COURT:  Do you understand that after the Court has

13   determined what advisory guidelines apply to your case, the Court

14   has the authority to vary or depart from the advisory guidelines

15   and impose a sentence that is more severe or less severe than the

16   sentence called for by the guidelines?

17           DEFENDANT HERNDON:  Yes.

18           DEFENDANT ELLIS:  Yes.

19           THE COURT:  Do you understand that in determining your

20   sentence, the Court is obligated to calculate the applicable

21   sentencing guideline range and to consider that range, possible

22   departures under the guidelines, and other sentencing factors

23   under 18 U. S. C. Section 3553(a)?

24           DEFENDANT HERNDON:  Yes.

25           DEFENDANT ELLIS:  Yes.

THE COURT:  Do you understand that parole has been abolished and, if you're sentenced to prison, you will not be released on parole?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  Do you understand that if the Court accepts your plea of guilty and the sentence ultimately imposed upon you is more severe than you had hoped for or expected, you will still be bound your guilty plea and would have no right to withdraw it?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  Do you understand if you plead guilty to this information, which charges you with a felony, you may lose important civil rights, such as the right to vote; the right to serve on a jury; the right to hold public office; and the right to own or possess a firearm?

DEFENDANT HERNDON:  Yes.

DEFENDANT ELLIS:  Yes.

THE COURT:  All right.  Next, I want to talk with you regarding the waiver of prosecution by indictment.  Each of you has the right to have this charge presented to a federal grand jury and I want to explain that process to you briefly.

A grand jury is composed of at least 16 and not more than 23 persons and at least 12 grand jurors must find that there is probable cause to believe that you committed the crime of which

1   you were charged before you may be indicted.

2        Do you see -- do either of you see any benefit of having

3   your case presented to a grand jury?

4             DEFENDANT HERNDON:  No.

5             DEFENDANT ELLIS:  No.

6             THE COURT:  Do you either of you see any disadvantage

7   to you of not having this case presented to a federal grand jury?

8             DEFENDANT HERNDON:  No.

9             DEFENDANT ELLIS:  No.

10            THE COURT:  All right.  Your counsel has been provided

11  with a Waiver of Indictment Form and I want to go over that with

12  you now, and this part, I'm going to do individually.

13       First of all, just because it happens to be the first file I

14  reached here, I'll going to go through Mr. Ellis's.  That form

15  includes what we call the style of the case, the United States of

16  America v. Scott E. Ellis, it has the criminal action number, and

17  it's entitled "Waiver of Indictment" and it states as follows:

18       "I, Scott E. Ellis, am accused of violating 31 U. S. C.

19  Section 5324(a)(3).  I have been advised of the nature of the

20  charge, of the proposed information, and of my rights.  I hereby

21  waive in open court prosecution by indictment and consent that

22  the proceeding may be by information rather than by indictment",

23  and there's space for you to sign and date, space for your

24  counsel to sign, and space for me to sign.

25       Now do you understand what I have just read to you?

1	DEFENDANT ELLIS:  Yes.

2	THE COURT:  Is there anything about the Waiver of

3	Indictment procedure that you don't understand or that you have

4	questions about?

5	DEFENDANT ELLIS:  No.

6	THE COURT:  All right.  If you're prepared to do so

7	then, I will ask that you sign and date the Waiver of Indictment

8	Form, I will ask your counsel to sign it, and then I'm going to

9	ask him to tender it to the Court in a moment, but I'm going to

10	go through Mr. Herndon's first.

11	MR. DIPIERO:  All right, Your Honor.

12	THE COURT:  All right.  Now, Mr. Herndon, I've also --

13	my staff has also provided your attorney with a Waiver of

14	Indictment as it relates to you and I want to go over that with

15	you now.  It contains the style of the case, United States of

16	America v. Stephen B. Herndon, the criminal action number.  It's

17	entitled "Waiver of Indictment", and it states, as follows:

18	I, Stephen B. Herndon, am accused of violating 31 U. S. C.

19	Section 5324(a)(3)  I have been advised of the nature of the

20	charge, of the proposed information, and of my rights.  I hereby

21	waive in open court prosecution by indictment and consent that

22	the proceeding may be by information rather than by indictment,"

23	and there's space for you to sign and date, space for your

24	counsel to sign it, and space for me to sign it.

25	Do you understand what I just read to you?

1     DEFENDANT HERNDON:  Yes.

2     THE COURT:  Anything about the Waiver of Indictment

3 procedure that you don't understand or that you have questions

4 about?

5     DEFENDANT HERNDON:  No.

6     THE COURT:  If you're prepared to do so then, I will

7 ask that you sign -- execute the Waiver of Indictment Form by

8 signing and dating it.  I will ask your counsel to sign then and

9 tender it to the Court, along with Mr. Ellis's.

10   All right.  I'll note for the record that Mr. Herndon has

11 signed and dated the Waiver of Indictment Form.  It has been

12 endorsed by his counsel.  I am now signing it, and I will order

13 that it be made a part of the recording this proceeding.

14   I will also note for the record that Mr. Ellis has signed

15 and dated the Waiver of Indictment Form.  It has been endorsed by

16 his counsel, and I am now signing it, and I will order that it be

17 made a part of the record for this proceeding.

18   Next, I want to talk with you both about your trial and

19 constitutional rights.  You have the right to plead not guilty

20 and maintain a not guilty plea throughout these proceedings,

21 including at trial.

22   You have the right to be represented by counsel.

23   You have to a speedy and public trial by a jury composed of

24 citizens of this district.

25   You have the right to confront and have an attorney cross-

1　examine witnesses and have your attorney move to suppress any

2　evidence he believes was illegally or unconstitutionally

3　obtained.

4　　　You have the right not to testify or otherwise incriminate

5　yourself and your exercise of this right cannot be held against

6　you.  Do you understand these rights so far?

7　　　　　DEFENDANT HERNDON:  Yes.

8　　　　　DEFENDANT ELLIS:  Yes.

9　　　　　THE COURT:  You have the right to have the government

10　come in here and prove its case beyond a reasonable doubt.

11　　　The jury's verdict would have to be unanimous.

12　　　You have the right to present evidence on your own behalf.

13　　　You have the right to testify on your own behalf at trial;

14　　　And you have the right to subpoena witnesses to testify for

15　you.

16　　　Do you understand all of these rights?

17　　　　　DEFENDANT HERNDON:  Yes.

18　　　　　DEFENDANT ELLIS:  Yes.

19　　　　　THE COURT:  Any of them that you don't understand or

20　that you have questions about?

21　　　　　DEFENDANT HERNDON:  No.

22　　　　　DEFENDANT ELLIS:  No.

23　　　　　THE COURT:  Other than your right to counsel, do you

24　understand that you will be giving up these rights by entering a

25　plea of guilty?

```
1              DEFENDANT HERNDON:  Yes.

2              DEFENDANT ELLIS:  Yes.

3              THE COURT:  Do you understand that once you have

4    entered a plea of guilty, there is not going to be any trial, no

5    jury verdict, and no findings of innocence or guilt based on

6    disputed evidence presented to me or to a jury?

7              DEFENDANT HERNDON:  Yes.

8              DEFENDANT ELLIS:  Yes.

9              THE COURT:  Do you believe that you fully understand

10   the consequences of entering a plea of guilty

11             DEFENDANT HERNDON:  Yes.

12             DEFENDANT ELLIS:  Yes.

13             THE COURT:  All right.  I note that there are

14   Stipulations of Fact.  Does counsel have any objection to the

15   Court utilizing those stipulations in consideration of the

16   factual bases for these pleas?

17             MS. THOMAS:   No objection, Your Honor.

18             MR. DIPIERO:  No objection.

19             THE COURT:  Mr. DiPiero, having reviewed this case and

20   these plea agreements in detail with your clients, do you believe

21   that they each fully understand their rights and fully understand

22   the consequences of entering a plea of guilty?

23             MR. DIPIERO:  I do believe that they each understand.

24             THE COURT:  All right.  Very well.

25          All right.  Mr. Herndon, will you please stand?
```

1    As to the charge contained in the single-count information

2    in your case, how do you plead, sir, guilty or not guilty?

3    DEFENDANT HERNDON:  Guilty, Your Honor.

4    THE COURT:  You may be seated.

5    Mr. Ellis, will you please stand?

6    As to the charge contained in the single-count information

7    in your case, how do you plead, sir, guilty or not guilty?

8    DEFENDANT ELLIS:  Guilty, Your Honor.

9    THE COURT:  You may be seated.

10    Each of you have been provided with a written Plea of Guilty

11    Form.  I would ask that you go over that with your counsel, sign

12    and date it.  Then I will ask him to tender each to the Court.

13    THE COURT:  All right.  I will note for the record that

14    each defendant has signed and dated the written Plea of Guilty

15    Form; each has been endorsed by his counsel; and I will order

16    that each be made part of the record for this hearing.

17    To each of you, is this plea the result of any threat or

18    coercion or harassment of you by anyone?

19    DEFENDANT HERNDON:  No, Your Honor.

20    DEFENDANT ELLIS:  No.

21    THE COURT:  Is it the result of any promise or

22    inducement other than those contained in the plea agreement?

23    DEFENDANT HERNDON:  No.

24    DEFENDANT ELLIS:  No.

25    THE COURT:  Are you pleading guilty to protect anyone?

1    DEFENDANT HERNDON:  No.

2    DEFENDANT ELLIS:  No.

3    THE COURT:  Are you acting voluntarily and of your own

4  free will in entering this guilty plea?

5    DEFENDANT HERNDON:  Yes.

6    DEFENDANT ELLIS:  Yes.

7    THE COURT:  Has anyone promised or predicted the exact

8  sentence which will be imposed upon you in this case?

9    DEFENDANT HERNDON:  No.

10    DEFENDANT ELLIS:  No.

11    THE COURT:  Do you understand that no one could know at

12  this time the exact sentence which will be imposed?

13    DEFENDANT HERNDON:  Yes.

14    DEFENDANT ELLIS:  Yes.

15    THE COURT:  Has your -- I'm going to do this part

16  separately.

17    Mr. Herndon, has your attorney adequately represented you in

18  this matter?

19    DEFENDANT HERNDON:  Yes.

20    THE COURT:  Has your attorney left anything undone

21  which you think should have been done?

22    DEFENDANT HERNDON:  No.

23    THE COURT:  Have you or your attorney found any defense

24  to the charge contained in the information?

25    DEFENDANT HERNDON:  No.

1          THE COURT:  Are you, in fact, guilty of the crime

2    charged in the information?  In other words, did you do it?

3          DEFENDANT HERNDON:  Yes.

4          THE COURT:  All right.  Mr. Ellis, has your attorney

5    adequately represented you in this matter?

6          DEFENDANT ELLIS:  Yes.

7          THE COURT:  And has your attorney left anything undone

8    which you think should have been done?

9          DEFENDANT ELLIS:  No.

10         THE COURT:  Have you or your attorney found any defense

11   to the charge contained in the information?

12         DEFENDANT ELLIS:  No.

13         THE COURT:  Are you, in fact, guilty of the crime

14   charged in the information?  In other words, did you do it?

15         DEFENDANT ELLIS:  Yes.

16         THE COURT:  All right.  I will find that each defendant

17   is competent and capable of entering an informed plea; that each

18   plea is freely and voluntarily made; that each defendant

19   understands the nature of the charges and is aware of the

20   consequences of the plea.

21      I will find that each defendant understands his rights and

22   understands that he is giving up these rights by entering a plea

23   of guilty.

24      I will defer a factual basis finding, but I will accept each

25   plea of guilty to each respective information and I will defer

1   adjudging each defendant guilty until the time of sentencing.

2        I will ask the probation officer to prepare a Presentence

3   Investigation Report for each defendant.

4        For each of you, it is important that you cooperate fully

5   with the probation officer in the preparation of the Presentence

6   Investigation Report.

7        If you fail to cooperate fully and truthfully with the

8   probation officer, you could be subject to an enhancement of your

9   sentence or the forfeiture of certain sentence reductions for

10  which you might otherwise be eligible.

11       It is also important that you not commit any additional

12  crimes between now and sentencing, as there may be additional

13  punishments imposed for committing additional crimes.

14       I'm going to set both of those sentencing on October 27th,

15  2014.  Mr. Ellis will be at 10:00 a.m.  Mr. Herndon will be at

16  1:30 p.m.

17       I will put all of my presentencing dates in my post-plea

18  orders for each of these cases.

19       Ms. Thomas, what's the government's position with regard to

20  bond

21            MS. THOMAS:  The United States does not oppose bond.

22       Further, Your Honor, it's my understanding that Mr. Herndon

23  has been given the opportunity to give presentations to members

24  of the West Virginia Bankers Association regarding structuring

25  throughout West Virginia and we would not be opposed, if it's

1  agreeable with Probation, that he be allowed to travel outside of

2  the Southern District to attend those.

3          THE COURT:  All right.  I assume there's no problem

4  with Probation for that?

5          PROBATION OFFICER JONES:  That's fine, Your Honor.

6          THE COURT:  All right.  I would propose then to let

7  each defendant be released on a $10,000.00 unsecured bond today

8  under the conditions identified in the Pretrial Services Report.

9          MR. DIPIERO:  Your Honor, each have some family stuff

10  that could cause them to go outside of the state.  Could the

11  Probation Department have the leeway to allow them, if they give

12  proper notice as to when they're going, where they'll be, and

13  when they'll be back?  I think a couple of times, Mr. Ellis, and

14  Mr. Herndon, once or twice, but that's not going to be any abuse

15  of that at all.

16          THE COURT:  I think, based on what you're describing,

17  as long as the defendants give advance notice of their travel

18  plans and get them approved by the probation officer, then that

19  should not be a problem.  I don't think we need to modify the

20  bond.

21      I have not yet signed the bond paperwork.  You'll want to

22  take a close look at them, if there's -- and make sure that --

23  I'm sure it's in order, because my courtroom deputy put them

24  together, but if there are any questions, you can let us now.

25      I've already signed my you part.  You just need to get with

1    her after the hearing to do your part of that paper work.

2        One note I wanted to make, and I not that this is in one of

3    the Pretrial Services Report.  If you have guns, you need to get

4    you rid of them.

5        MR. DIPIERO:  Yes, Your Honor.  I believe Mr. Herndon

6    already has.  Mr. Ellis has got them in a safe in an outbuilding

7    that is he's going to get off his property.  It's not in his

8    house and needs to and is going to get that done very quickly.

9        DEFENDANT ELLIS:  Yes.

10       THE COURT:  All right.  They need to be out of your

11   possession.  All right.

12       MR. DIPIERO:  And we will be filing the 100.00 receipt.

13       THE COURT:  For the special assessments?

14       MR. DIPIERO:  For the special assessments.

15       THE COURT:  That's fine.  We've noted that now for the

16   record and you can take care of that, also, with the courtroom

17   deputy after the conclusion of the hearing.

18       Anything else we need to take up today in these cases?

19       MS. THOMAS:  No, Your Honor

20       MR. DIPIERO:  No, Your Honor.

21       THE COURT:  All right.  Thank you.

22       (Proceedings concluded at 11:10 a.m., July 16, 2014.)

23

24   CERTIFICATION:

25       I, Ayme A. Cochran, Official Court Reporter, certify that

1    the foregoing is a correct transcript from the record of

2    proceedings in the matter of United States of America, Plaintiff

3    v. Stephen B. Herndon and Scott E. Ellis, Defendants, Criminal

4    Action Nos. 2:14-cr-00110 and 2:14-cr-00111, as reported on July

5    16, 2014.

6

7    s/Ayme A. Cochran, RMR, CRR                    November 19, 2014

8    Ayme A. Cochran, RMR, CRR                          DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25