```
                  IN  THE  UNITED  STATES  DISTRICT  COURT
              FOR  THE  SOUTHERN  DISTRICT  OF  WEST  VIRGINIA
                             AT  CHARLESTON
_____x
                              :
UNITED STATES OF AMERICA,     :          Criminal Action
                              :
              Plaintiff,      :          Nos.  2:14-cr-110
                              :                2:14-cr-111
v.                            :                2:14-cr-112
                              :                2:14-cr-114
                              :                2:14-cr-115
                              :
STEPHEN HERNDON,              :          Date:  December 8, 2014
SCOTT ELLIS,                  :
ALVIS PORTER &                :
DAVID HERNDON,                :
                              :
              Defendants.     :
_____x
```

```
                TRANSCRIPT OF MOTIONS HEARING HELD
         BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
                 UNITED STATES DISTRICT COURT
                 IN CHARLESTON, WEST VIRGINIA


APPEARANCES:
For the Government:      AUSA MEREDITH GEORGE THOMAS
                        U.S. Attorney's Office
                        P.O. Box 1713
                        Charleston, WV  25326-1713


For the Defendants:     J. TIMOTHY DIPIERO, ESQ.
                        DiTrapano Barrett & Dipiero
                        604 Virginia Street East
                        Charleston, WV 25301

                        JOHN A. CARR, ESQ.
                        Suite 209
                        179 Summers Street
                        Charleston, WV 25301

                        MICHAEL B. HISSAM, ESQ.
                        Bailey & Glasser
                        209 Capitol Street
                        Charleston, WV 25301-1386


Court Reporter:         Ayme Cochran, RMR, CRR


Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1          PROCEEDINGS had before The Honorable Thomas E. Johnston,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on December 8, 2014, at

4    10:08 a.m., as follows:

5          COURTROOM DEPUTY CLERK:  The matter before the Court is

6    the United States of America versus Stephen Herndon, criminal

7    action number 2:14-cr-110; United States v. Scott Ellis, criminal

8    action number 2:14-cr-111, United States v. Alvis Porter,

9    criminal action number 2:14-cr-112; United States v. Ronald

10   Barnette, 2:14-cr-114; and United States v. David Herndon,

11   2:14-cr-115, scheduled for a motions hearing.

12          THE COURT:  As much as I hesitate to say this, good

13   morning.  Will counsel note their appearances?

14          MS. THOMAS:  Meredith George Thomas on behalf of the

15   United States.

16          MR. HISSAM:  Mike Hissam on behalf of Ronald Barnette,

17   who is present in the courtroom; Defendant Scott Ellis, who is

18   present in the courtroom, and sitting to my immediate left.

19          MR. DIPIERO:  Tim DePiero on behalf of Mr. Alvis

20   Porter, who is also present, Your Honor.

21          MR. CARR:  John Carr on behalf David Herndon and

22   Stephen Herndon, who are present in the courtroom

23          THE COURT:  Anybody else want to note an appearance?  I

24   know I see a lot of other lawyers around the courtroom.

25          All right.  I set this matter for a hearing because we've

```
 1   got a little bit of a mess on our hands, and I can't resist
 2   starting out by saying, Mr. DiPiero, I told you so, but where it
 3   stands, I believe, is that Mr. DiPiero has conceded that he has a
 4   conflict and has to get out of these cases; is that correct?
 5            MR. DIPIERO:  Yes, Your Honor.
 6            THE COURT:  All right.  So let's start then.  You have
 7   -- Mr. Roeher has already been sentenced.
 8            MR. DIEPIERO:  Yes, Your Honor.
 9            THE COURT:  And then you have previously made
10   appearances for Stephen Herndon, Scott Ellis, and Alvis Porter?
11            MR. DIPIERO:  Yes, sir.
12            THE COURT:  All right.  And you are moving to withdraw
13   from all three?
14            MR. DIPIERO:  No, just from Mr. Herndon and from Mr.
15   Ellis, not from Mr. Porter.
16            THE COURT:  Are you sure about that?
17            MR. DIPIERO:  I'm fairly confident about that one, Your
18   Honor, yes.
19            THE COURT:  You told me you were fairly confident about
20   something before, Mr. DiPiero.
21            MR. DIPIERO:  I agree, but I'm confident I'm okay with
22   Mr. Porter.
23            THE COURT:  By the way, both of you -- Mr. Hissam, you
24   said that you entered an appearance for Mr. Ellis and, Mr. Carr,
25   the elder Mr. Herndon.  That's not a done deal, okay?
```

```
1              MR. HISSAM:  I understand, Your Honor.

2              MR. CARR:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. DIPIERO:  Your Honor, if there is anyone who would

5    object, they would be here today, about my representing Mr.

6    Porter.

7              THE COURT:  I might object.

8              MR. DIPIERO:  Oh, I'm sorry.  I meant --

9              THE COURT:  I'm serious.  I --

10             MR. DIPIERO:  Yes, sir.

11             THE COURT:  You know, this is a mess.

12             MR. DIPIERO:  Yes, sir.

13             THE COURT:  And this is the second time I've allowed

14   this to happen and, in both times, it blew up and, you know, I'm

15   not really inclined to let it go forward.  So we're going to have

16   to talk this all out today.  So, you know, you're going to move

17   to withdraw from Herndon and Ellis.  Apparently, everybody agrees

18   that that's appropriate.  You know, we'll wait for the 2255 on

19   Roeher.

20        You can have a seat.

21        So, it seems to me, we've got a question then as to whether

22   or not you can continue to represent Mr. Porter.  Now, this all

23   came about originally as a result of Mr. Hissam's motion to

24   relieve you as counsel for Mr. Ellis and to enter an appearance

25   for Mr. Ellis and, Mr. Hissam, I have to confess, I saw that as a
```

1    little ironic, given that you already represented Mr. Barnette.

2         So, you know, I'm not really in the mood for joint

3    representation in this case, at this point, and the problem is,

4    as I explained in detail to Mr. DiPiero back in the spring, is

5    these guys were all doing business at one place.  I know they --

6    they own different companies, some of them had joint ownership,

7    but they were all doing business at the same place.

8         It's not exactly a Metropolitan area.  So there's tremendous

9    potential here for there to be conflict that none of us see

10   today.  I felt that way about this last spring.  It turned out

11   that feeling was justified.  So, tell me why I should allow you

12   to make an appearance on behalf of Mr. Ellis.

13            MR. HISSAM:  Yes, Your Honor, and I would like to spend

14   some time dealing with this issue.  I expected the Court would be

15   concerned about it.  That's why, in my motion for substitution of

16   counsel, I made sure to disclose the fact that I represented

17   Defendant Ronald Barnette.

18        The key simplest explanation I can give the Court, and I'll

19   go into greater detail, is that this is a classic hocus pocus

20   conspiracy allegation.  The problem, from my perspective, with

21   Mr. DiPiero's representation, joint representation of certain

22   defendants in this case, is that they rested on the same spoke,

23   not on different spokes and, in these cases, in conspiracy cases,

24   that becomes very important.

25            THE COURT:  Are you sure you see the whole bicycle?

1          MR. HISSAM:  I believe I do, Your Honor, if I can

2     explain.

3          THE COURT:  So didn't he six months ago.

4          MR. HISSAM:  Your Honor, Mr. DiPiero -- I've reviewed

5     the transcripts closely of the two prior hearings and, for the

6     record, I will note that that was July 9th, at Mr. Roeher's plea

7     hearing, where this was discussed in detail by Mr. DiPiero and,

8     on July 16th, at Mr. Herndon -- Mr. Stephen Herndon's and Mr.

9     Ellis's plea hearing, which was a joint plea hearing, which it

10    was discussed in great detail.

11         As I understand it, and I will let Mr. DiPiero speak for

12    himself, but as I understand it, his firm previously represented

13    Defendant Alvis Porter, and had in another matter for sometime.

14    He then was contacted by Defendant Roeher, who was a close

15    personal friend of his, had been for fifteen years.

16         I understand it and, I believe, as Mr. DiPiero continues to

17    understand today, I think the government, Mr. Porter and Mr.

18    Roeher, in my view, did not have an actual impermissible conflict

19    and I will use the terminology "actual impermissible conflict" to

20    mean in the *Wheat* case, the big seminal case in the United States

21    Supreme Court on conflicts, in the *Wheat* case, the Supreme Court

22    talks about two things, an actual impermissible conflict, which

23    is what I would call would be a real live conflict as we sit here

24    today;

25         And then, second, the serious potential for a conflict and,

in the *Wheat* case, the Supreme Court said, "District judges must have discretion, not only in the case of an actual conflict, but in a serious potential for a future conflict to disqualify counsel, and it's a case-by-case determination to be made by the district judge in his or her discretion."

In my view, between Mr. Porter and Mr. Roeher, Mr. DiPiero did not have an actual conflict because they were not business partners, they did not rest on the same spoke.  I don't believe that he had potential for a conflict, and I don't -- I don't know where that stands today.  I'll defer to him.

Where things went off the rails, Your Honor, from my perspective, is when Defendant 3 got out.  Defendant 3 was Stephen Herndon.  Defendant 3 was a business partner with Roeher.  At that moment, Lawyer DiPiero had two clients resting on the same spoke, who were in the same business.

Now, Your Honor will understand that when two gentlemen are in the same business, they're familiar with each other's dealings.  And I mean the same factual dealings.  I don't mean the general conduct of the conspiracy.  They're familiar with the business's finance.  They're often participants in joint conversations.  They often have the same bookkeeper.  They often were at the same meetings.  They often made joint business decisions.

That is the issue that arose when Mr. DiPiero attempted to represent Stephen Herndon and Mr. Roeher.  He then had three

1    clients and, at that point, my position is the United States was

2    aware because, on Sunday, March the 23rd, Mr. DiPiero represented

3    to the Court at one of these hearings, on Sunday, March 23rd, a

4    12-hour meeting took place at the DiTrapano Law Firm and, at that

5    meeting, had Mr. Roeher present, and Mr. Herndon present, and

6    there was a discussion of Mr. Ellis in that meeting and there was

7    a discussion that Mr. Ellis was going to be approached the next

8    day.

9         And, the Court may recall, at the July 9th hearing, said --

10   asked a question.  Your Honor asked Mr. DiPiero, because Mr.

11   DiPiero had said, "They told us not to talk," and Your Honor

12   said, "Who told you not to talk," and Mr. DiPiero said, "Thomas

13   Ryan, the government," told Stephen Herndon and Mr. DiPiero not

14   to tell Mr. Ellis that the government was going to come and see

15   him the next morning.

16        That's where things got very strange, Your Honor, because

17   Mr. Ellis was about to be approached by federal law enforcement.

18   He was about to be interviewed.  In fact, he was interviewed the

19   next day, Monday, March 24th, at the IRS Task Force here in

20   Charleston.  He was interviewed without a lawyer present and, at

21   the end of that interview, law enforcement made a telephone call

22   to Mr. Ryan and Mr. Ryan then said, "What do we do with Mr.

23   Ellis," and Mr. Ryan purportedly said, "Give him to Tim DiPiero."

24        Law enforcement then escorted Mr. Ellis to Mr. DiPiero's

25   office, whom he had never met and, at that point, Your Honor, he

1    got a fourth client.  Now, that conflict was actual, and it was

2    real, and the reason was, because just like Mr. Roeher and Mr.

3    Stephen Herndon, Mr. Ellis was business partners with Mr. Stephen

4    Herndon in the same case, in the same business, and Tri-State

5    Mine Repair.  More importantly, Mr. Herndon had previously been

6    inside at Arch, had worked at Arch for two years, at which point

7    in time, Mr. Ellis was a vendor, and Your Honor can imagine the

8    conflicts created by that scenario.

9        And so, you have -- now you have two different sets of

10   business partners in the same business on the same spoke of an

11   alleged conspiracy who are represented by joint counsel.  That's

12   the exact fact pattern that was in the *Week* case.  That's the

13   exact fact pattern that was in this Court's *Hersman* case back in

14   March of 2013, where you have Client A v. Client B and, Your

15   Honor, it could not be any clearer in this case, in terms of

16   Stephen Herndon and Mr. Ellis, than the government's sentencing

17   memorandum from Mr. Herndon, Stephen Herndon, which is

18   Document 22 in case number 2:14-cr-110, and the United States

19   says on Page 3, "Mr. Stephen Herndon provided information that

20   assisted in the cooperation of Ellis.  This information",

21   dropping down, "This information provided leverage to induce

22   guilty pleas from those individuals."  Your Honor, to me, that's

23   classic conflict.  That's Client A on Client B inducing a guilty

24   plea.

25       Now, you turn to Mr. Barnette and Mr. Ellis.  Mr. Barnette

1    and Mr. Ellis have never been business partners in any business.

2    They have never been in a joint business venture of any sort.

3    Mr. Barnette has been at Mining Repair Specialist, MRS, his

4    entire career.  He also has a company called LMF, which Mr. Ellis

5    has nothing to do with.  They're, quite simply, not remotely, and

6    not alleged to be remotely, on the same spoke of a conspiracy.

7              THE COURT:  Well, I don't know about spokes, but the

8    government says in its response to your original motion that,

9    "The Defendant now asserts that he was not engaged in any

10   criminal conduct with Ronald Barnette" -- "defendant", referring

11   to Mr. Ellis, "who is currently represented by Michael Hissam.

12   The United States also disagrees with that assertion."

13             MR. HISSAM:  And, as I point out in my reply, Your

14   Honor, we disagree with their disagreement, but because the

15   United States has not decided to tell us what their disagreement

16   is factually, Your Honor, I don't know what the conflict is.

17        And, if you turn to the next page, Your Honor, the top of

18   Page 2, Paragraph 3, "The United States does not oppose

19   Defendant's motion for substitution of counsel, so long as

20   Defendant Ellis and Defendant Barnette enter into any applicable

21   waivers."

22        So, Ms. Thomas said in Paragraph 3 on Page 2, Ms. Thomas has

23   said that this is a waivable conflict, which in the week case,

24   that means this is an actual conflict.  This isn't Category I.

25   This isn't an actual impermissible, irreconcilable conflict.

1    It's a conflict that in the United States' mind, is subject to

2    waiver, which I have, and prepared to tender to the Court and

3    allow Mr. Barnette and Mr. Ellis to participate in a full

4    colloquy with the Court.

5         Your Honor, I understand the Court's hesitation given what

6    has happened so far.

7              THE COURT:  Hesitation is a generous description.

8              MR. HISSAM:  I understand, Your Honor, and my response

9    to that would be that, given what has happened so far, the

10   fundamental breakdown in this case was with the two business

11   partners, the joint representation of two business partners,

12   which Your Honor suggested at both of these hearings, in these

13   transcripts, suggested that while Porter and Roeher may be okay,

14   you saw problems with Roeher/Herndon and Herndon/Ellis, and those

15   are the problems that have developed, and you also pointed out

16   that you saw problems at sentencing, and it will not surprise the

17   Court that this issue came to a boiling point on November 11th,

18   Veteran's Day, November 11th of this year, and that Mr. Stephen

19   Herndon's sentencing hearing was set for the very next day,

20   November 12th.

21        And that's exactly what happened, Your Honor, the sentencing

22   of a co-defendant's business partner, and the issues with

23   sentencing, and the arguments that were going to be made at

24   sentencing, are what brought this to the forefront.  Those issues

25   with a co-defendant business partner do not exist between Mr.

1   Barnette and Mr. Ellis.

2      And I know that this is a difficult issue and, Your Honor,

3   I, myself, have been in this issue earlier this year or,

4   actually, it was last year, in 2013, in a criminal case in the

5   Western District, Virginia, and the judge there, Jim Jones, James

6   Jones, confronted this same issue where I represented a defendant

7   who was going to trial.  One of my law partners represented a

8   defendant who was a defendant in an information case who was

9   going to testify at trial.  The government attempted to

10   disqualify us.

11      We briefed the issue, we had a hearing, the Court conducted

12   colloquies, and the Court, Judge Jones, decided an opinion, it's

13   not published, but it's on Westlaw, decided that we could, under

14   the *Wheat* case, and under Fourth Circuit precedent, continue to

15   represent David Cline, even though my firm continued to represent

16   a witness and who testified -- and actually did testify at that

17   trial because of the different spokes of a conspiracy.

18         THE COURT:  I don't know what that's supposed to

19   convince me of here.  That's a different case, different judge,

20   different district, different facts.

21         MR. HISSAM:  Sure.

22         THE COURT:  That's not going to convince me of anything

23   in this case.

24         MR. HISSAM:  Sure.  And I just mentioned, Your Honor,

25   that it is a case-by-case, fact-by-fact scenario, because it's a

1    difficult issue where the Court is -- the Court is weighing a

2    defendant's constitutional right to retained counsel of his

3    choice against a potential conflict, and there are two competing

4    interests; conflict-free representation, on the one hand, which

5    is in the interest of justice and protected by the Fifth

6    amendment and, on the other hand, a defendant's right to counsel

7    of free choice.

8         And, I would argue, Your Honor, that because constitutional

9    issues are involved, any remedy must be narrowly tailored.  It

10   must not be --

11            THE COURT:  Well, the simplest thing is for everybody

12   to have their own lawyer.  Then you don't have such a problem.

13            MR. HISSAM:  Your Honor, I would say it's a blanket per

14   se rule.  The reason that the Supreme Court and the Fourth

15   Circuit have never adopted that per se rule because, in their

16   precedence, they continue to say that even co-defendants can be

17   represented by the same lawyer.

18            THE COURT:  Any of those cases involve a situation

19   where the thing has already blown up in everybody's face once in

20   the very same case?

21            MR. HISSAM:  Your Honor, I would say that it has blown

22   up with respect to co-defendant business partners and --

23            THE COURT:  But I don't know what I don't know, and

24   neither do you, and these guys are all involved in the same

25   general practice at the same mine, okay?

```
 1          That's the problem I have with this, is -- and this is the
 2     problem I had back when I talked to Mr. DiPiero about it months
 3     ago.  I didn't know what I didn't know.  I don't know what he
 4     knew then, but he thought he could do it, and Mr. DiPiero has --
 5     in spite of what he might be thinking right now, he has a lot of
 6     credibility with me.  He's an excellent lawyer, all right, and a
 7     very experienced lawyer in criminal matters, and he thought he
 8     could do this and, in large part, I let it go based on his
 9     credibility, but I've learned from this and Mr. DiPiero didn't
10     know what he didn't know.
11          Now, you're telling me he might have known some of this.  I
12     don't know.  I didn't know.  But I've been burned once in this
13     case already and you're not really doing a good job of convincing
14     me I should dive right back into this again today, because it
15     would just be simpler if every defendant had their own
16     conflict-free lawyer.  Then you don't have any of these problems.
17               MR. HISSAM:  Except for, Your Honor, that as a per se
18     rule, that deprives a defendant of his choice of lawyer.
19               THE COURT:  It's not a per se rule.  It's a rule for
20     this mess to get us through it.  I'm not -- I'm very -- trust me.
21     After -- I've had this come up twice and, both times, it's broken
22     down, okay?  So I'm tempted to adopt a per se rule, I am, because
23     it would just make life simpler, but I understand, among other
24     things, there are economics involved in this and a variety of
25     other factors why defendants may want to have the same lawyer;
```

1      So I'm not adopting a per se rule, let's be clear about

2  that, but in this case, it would certainly be simpler, given the

3  history that we now have in the case, if every defendant had

4  their own lawyer.  Don't you agree with that?

5           MR. HISSAM:  I believe, Your Honor, that it would be

6  simpler and, from the Court's perspective, would offer the

7  advantage of not having to deal with conflict issues.  I do not

8  believe, though, that it would be permissible because there is

9  not a disqualifying conflict for Mr. Barnette and Mr. Ellis and,

10 therefore, that rule, applied here in this case, deprives them of

11 their right to retained counsel of their choice.

12           THE COURT:  So the choice -- the dilemma that you put

13 me in is either deny them -- deny Mr. Ellis the opportunity to

14 have you represent him and face reversal on appeal, or allow it,

15 and face a reversal on a 2255?

16           MR. HISSAM:  Your Honor, this is the dilemma that the

17 Courts have been faced with, and the only reason I mentioned the

18 Virginia case, Your Honor, is just an example of -- I've been

19 through this situation where --

20           THE COURT:  Well, no, you haven't, because -- because

21 my colleague, Judge Jones, was not facing a situation where the

22 thing had already blown up once, all right, and didn't have that

23 history.  That's different, isn't it?

24           MR. HISSAM:  Well, Your Honor, I would say it did blow

25 up because the government raised a serious issue and asked for a

1    disqualification of counsel, which -- you know, so it certainly

2    came front and center and the government maintained that counsel

3    was disqualified.  Now, that's different, obviously, than this

4    case, where Ms. Thomas is saying that counsel does not need to be

5    disqualified, and is agreeing to -- is agreeing to representation

6    provided waivers exist.

7         Your Honor, all I can say about the 2255 is that is why the

8    colloquy and waiver process exists.  That's why Mr. Barnette and

9    Mr. Ellis are here and prepared to answer the Court's questions.

10        I understand the difficulties.  I understand that

11   ineffectiveness is not subject to waiver.  I understand that.

12   But in -- from the *Wheat* case on down, there has been a colloquy

13   that takes place between the Court and joint defendants in a

14   joint representation case that the Courts have adopted as a way

15   to sooth concerns over an eventual 2255.

16        Your Honor, I am -- I understand the Court's frustration

17   with how this came to be.  It is a highly, highly unusual fact

18   pattern.  In all the conflict cases I've looked at, I've never

19   seen one with a fact pattern like this.

20            THE COURT:  And, therefore, I don't think, no matter

21   what I do, you can draw a per se rule out of anything.

22            MR. HISSAM:  Perhaps, Your Honor.  Perhaps.

23            THE COURT:  All right.  Well, let's see if Mr. Carr

24   still thinks it's such a good idea to represent two defendants in

25   this case.

1      MR. CARR:  Your Honor, first, I would state for the

2  record that I have only discussed the terms of the representation

3  with Mr. Steve Herndon.  I have not discussed any confidences and

4  have not even requested his file from Mr. DiPiero, given that the

5  Court had not actually acted upon Mr. DiPiero's Motion to

6  Withdraw.

7      THE COURT:  Have you entered an appearance?

8      MR. CARR:  Yes, Your Honor, I have entered an

9  appearance, but I have no confidences from Mr. Herndon, realizing

10  the Court may or may not actually recognize my appearance or

11  permit that appearance.

12      THE COURT:  Well, my question then is, having heard my

13  discussions with Mr. Hissam, are you sure you want to do this?

14      MR. CARR:  Your Honor, I would say this in regards to

15  the -- Mr. David Herndon and Mr. Steve Herndon, and I had

16  discussed this with David Herndon from the very beginning.  They

17  are father and son.  They were not business partners.  Neither

18  one of them had any knowledge of the other's activities in this

19  case.  David Herndon was not aware of Stephen Herndon's

20  activities.

21      THE COURT:  But you haven't discussed any confidences

22  with them, right?

23      MR. CARR:  Sir, I have not discussed any confidences,

24  other than that one question, and I also asked the government.

25  "Mr. Steve Herndon, did you know anything about your father's

```
1    activities," and the answer to that was no.  I have also

2    discussed that with David Herndon.  I have otherwise not

3    discussed a single fact or conversation regarding Steve Herndon.

4              THE COURT:  Are you sure you know what you don't know?

5              MR. CARR:  Your Honor, I am confident, given the

6    discovery in the case and the fact that they did not know each

7    other's activities at the time it was taking place, that there is

8    not any conflict, or any even remotely real possibility of

9    conflict between father and son.

10       Your Honor, I would also just state, and I certainly believe

11   that the Court's feelings on this are very clear to anyone who is

12   in this courtroom right now.

13             THE COURT:  That was the intent.

14             MR. CARR:  Yes, sir.  However, given the number of

15   defendants that are not only in this case, but in related cases,

16   given how this matter actually came to light in a number of the

17   other investigations which have permitted this investigation by

18   the government, there are significant -- there is a significant

19   number of conflicts with the criminal defense bar in this

20   district.

21             THE COURT:  So, what you're telling me is, there's more

22   to come?

23             MR. CARR:  Your Honor, I don't know if there's more to

24   come.  It's just there's a lot of -- the lawyers who typically

25   appear in federal District Court who have conflicts in this
```

1    matter and are not available to someone like Mr. Steve Herndon to

2    actually come in and for him to feel comfortable with

3    representation.

4           THE COURT:  Well, that may be, although there are, for

5    example, some excellent lawyers in the Northern District.  I know

6    that from experience and, to the extent that there's a conflict,

7    there's -- the availability of local lawyers is really beside the

8    point, isn't it?

9           MR. CARR:  Your Honor, it is to the extent that, if

10   there actually is a conflict, that we just understand the Court

11   otherwise might question, why doesn't everybody just, you know,

12   go out and go ahead and get individual counsel and, in this case,

13   given the number of conflicts, there's a number of

14   considerations, I think, on behalf of defendants, such as Stephen

15   Herndon, as to why he might want to pick somebody who does not

16   have a conflict, but is otherwise involved and familiar with the

17   case.

18          THE COURT:  Well, let's hear from the government.

19          MS. THOMAS:  In regard to Mr. Ellis's motion, I'll talk

20   about that first.  As far as I know, in regards to Mr. Barnette

21   and Mr. Ellis, everyone is still cooperating.  There's been no

22   Motion to Withdraw from guilty pleas.

23     I did, in the response, want to make sure the Court was

24   aware that it is the United States' position that Mr. Barnette

25   and Mr. Ellis did participate in criminal activity together and

1   that if any -- if either of those defendants attempted to

2   withdraw from their plea agreement, or their guilty plea, or some

3   reason testimony was needed, either could potentially be a

4   witness against the other, and that was the purpose of pointing

5   that out to the Court.  That --

6        THE COURT:  There appears to be a disputed fact on that

7   point and, at this point, I'm aware of no facts one way or the

8   other, but you and Mr. Hissam don't seem to agree on that point.

9        MS. THOMAS:  Mr. Hissam has received a Memorandum of

10  Interview regarding an interview with Mr. Ellis where Mr. Ellis

11  has provided information about how he would contact Mr. Barnette

12  when they were placing bids at Mt. Laurel at the direction of

13  Steve Herndon to discuss what their bids would be and, while Mr.

14  Herndon, when he talked to Mr. Ellis, wouldn't give a specific

15  bid amount, he may have given them a range, and I'm just

16  proffering this out of the Memorandum of Interview, and then

17  Ellis would call Mr. Barnette and tell him what Tri-State, his

18  company, was going to bid.  Those were the transactions that Mr.

19  Ellis would be paying a kickback on, as well.  So they do have

20  evidence against each other in regard to that.

21      Mr. Barnette would submit a bid understanding that he

22  wouldn't get the job -- sorry -- wouldn't get that job.  So, I

23  think -- and, also, I believe Mr. Barnette told us, at one point,

24  and I believe Mr. Hissam was at the interview, that he had

25  actually approached Mr. Ellis and tried to get him to stop paying

1   kickbacks, which is commendable, but again, there's more evidence

2   that they knew what the other one was up to and they participated

3   together in a conspiracy.

4        But, assuming they're going to go through with sentencing,

5   they don't tell a really different story, they don't have a

6   conflict of fact in what they're saying, and so, in that regards,

7   the United States does not object to Mr. Hissam representing Mr.

8   Ellis.

9             THE COURT:  Maybe you should.

10       I -- just as a comment, I think the government -- I know you

11  stepped in sort of on the tail end of all this, but I think the

12  government should be a little bit more vigilant on recommending

13  in these situations separate counsel just to avoid this very

14  situation.  That just would be cleaner.  That doesn't -- I mean,

15  that's a -- that's a small comment.  I think this is a defense

16  counsel issue really, but in the beginning, sometimes the

17  government is the only party that has a lawyer involved.  So, I

18  offer that comment for future reference.

19            MS. THOMAS:  Thank you, Your Honor.

20            THE COURT:  Mr. DiPiero, I guess we've come back around

21  to you.  First of all, I'm going to have to continue Mr. Porter's

22  hearing on Thursday because I have a scheduling problem and, at

23  this point, given the history of all of this and your involvement

24  in it, it seems to me you're probably going to have to convince

25  me why I should allow you to continue to represent Mr. Porter.

1    Now, you can -- I mean, I'll hear from you now, but I have a

2    feeling what I probably should do is have everybody brief this a

3    little bit further so that I can assess it more carefully,

4    especially given the fact that I am -- you know, I've read a

5    couple of the -- I've read Mr. -- I've read Stephen Herndon's

6    Presentence Report now, and I've read Mr. Roeher's, so I have a

7    much better sense of the facts than I did at the plea hearings,

8    but I'm still probably the least informed person in this room

9    about the facts of this case and the relationships among these

10   parties, so I think I'm going to need some briefing in order to

11   determine exactly, you know, what I should do with these issues,

12   but I will hear from you now.  You -- we started with you, maybe

13   I'll finish with you.

14        MR. DIPIERO:  Well, first, let me just say, I apologize

15   that we're in this mess.  I wish I would have heeded your caution

16   based upon your experience.  I had not had the experience before

17   and so I do regret that we're here.

18    I'm not going to say anything about Mr. Ellis and Mr.

19   Herndon because I don't want anything to be misconstrued as

20   violating the attorney-client privilege.  You've asked me

21   strictly about Mr. Porter, at this point.

22    And, I would submit that I had represented Mr. Porter first.

23   I had represented him on other matters, civil matters, and he was

24   the first person that came to me with respect to any of this, and

25   that his job is totally unrelated to the jobs that Mr. Roeher,

1   Mr. Ellis and Mr. Herndon have and they really -- really had no
2   business contact during this process.  Mr. Porter did not deal
3   with Mr. Herndon, for instance.
4        And, so I would respectfully submit that, although I know
5   it's -- it looks awful and this thing is very difficult for Your
6   Honor, I appreciate your comments, and I wish I would have
7   appreciated them more earlier.  This was something unusual for
8   me.  It never happened before, particularly where the government
9   asked me to talk to Mr. Ellis, and that was really unusual, and
10  it wasn't -- I didn't think they were doing anything improper.  I
11  wasn't being a flunky for them.  It was just one of those
12  situations where I didn't perceive Mr. Ellis as coming in any
13  later than the other two.  He just happened to not be available
14  that weekend.  He was just out of town.  I felt like they all
15  came in at the same time, as far as I was concerned.
16       And so, at any rate, I respectfully -- I know Mr. Porter
17  would like for me to continue to represent him.  I don't think he
18  has any actual or even really potential conflict.  I will tell
19  you that there was -- there was some hearsay statements made by
20  Mr. Herndon that --
21            THE COURT:  Stephen or --
22            MR. DIPIERO:  That related to Mr. Porter.
23            THE COURT:  Which Herndon?
24            MR. DIPIERO:  Steve Herndon.
25            THE COURT:  Okay.

1          MR. DIPIERO:  That came up and I wanted to be open

2     about that.  It's actually in Mr. Porter's Presentence Report, if

3     you've seen it.  It's really a minor area.

4          It doesn't have anything to do with the ultimate issues, but

5     I had checked Mr. Porter, and Mr. Lusk, who it involves, denied

6     the hearsay, and Mr. Herndon, I believe, would state that he

7     doesn't know if it's true or not.  He was asked if he heard

8     anything.

9          So that's the only thing that I've seen that's come up in

10    any way, shape or form between Mr. Herndon, Mr. Roeher, and Mr.

11    Ellis related to Mr. Porter at all and I can't think of anything

12    else that has ever come up because they just really didn't have

13    any dealings together and so I would, most respectfully, even

14    though I'm right in the middle and at the heart of all of this

15    mess, respectfully, on behalf of Mr. Porter, request -- one of

16    the problems is not just the availability, I know that's been

17    mentioned, but for someone to start from scratch, it would be

18    difficult and costly and, I believe that Mr. Porter is ready for

19    his medicine, and has been waiting for sometime, and we most

20    respectfully would like to go forward with our sentencing as soon

21    as your schedule is available, if I'm allowed to stay involved.

22          THE COURT:  All right.  Do you want to submit something

23    in writing in support?

24          MR. DIPIERO:  On that issue, I can.  I was -- I was not

25    prepared to put anything in writing with respect to Mr. Herndon

```
 1    or Mr. Ellis.
 2              THE COURT:  Well, at this point, I'm just -- you've
 3    conceded that you had to get out of the Ellis and Herndon cases,
 4    but if you want to submit something in writing, I will allow you
 5    to.
 6              MR. DIPIERO:  Yes, sir.
 7              THE COURT:  And I'll -- I will consider it.
 8              MR. DIPIERO:  Thank you, sir.
 9              THE COURT:  We'll talk about the timing of that in a
10    moment.
11        Mr. Hissam, I think I probably need to -- I think we need to
12    brief your situation further.  I will -- well, how long do you
13    need to file a -- first of all, let's talk about when is -- when
14    are Mr. Barnette and Mr. Ellis's -- I know Mr. Ellis is not set
15    for sentencing until February or March.
16              MR. HISSAM:  It's in February, Your Honor, the first
17    week of February, and Mr. Barnette's is January 21st (sic).  On
18    the 12th.  I'm sorry, Your Honor, 12th.
19              THE COURT:  Okay.
20              MR. HISSAM:  So, the sentencing memos, just for the
21    Court, you know, to take into account, the sentencing memo in Mr.
22    Barnette's case is due January 5th.
23              THE COURT:  Okay.
24              MR. HISSAM:  Your Honor, I could brief -- I could
25    certainly brief it within ten days, fourteen days, whatever the
```

1    Court prefers.

2         I would, if I could, Your Honor, address one issue, which

3    is, given the argument, the legal argument I've made, in

4    stressing client choice and choice of retained counsel, to the

5    extent that this will be the last time we're before the Court in

6    a live hearing, I would at least like to proffer the existence of

7    a waiver and tender the waivers to the Court so that they'll be

8    in the record.

9         Otherwise, if we're not going to be back in front of the

10   Court, I would rather do it here live in person and, even if the

11   Court wanted to conduct a colloquy, understanding that it may be

12   for naught under the Court's legal reasoning, but so that that's

13   in the record and I'm not just arguing in a brief.

14            THE COURT:  Well, here's my suggestion, because I might

15   very well have another hearing on this after the briefing.  Right

16   now, I'm not sure that I could conduct an intelligent colloquy

17   because I don't know enough.  So I would suggest that you submit

18   with your brief the waivers and then I will consider whether or

19   not to have another hearing, the purpose of which may very well

20   be solely to conduct that colloquy, I don't know, but I don't

21   know that I am well informed enough about this at this point --

22            MR. HISSAM:  Sure.

23            THE COURT:  -- to conduct the colloquy I need to

24   conduct.  So, fourteen days works for you to file a memorandum?

25            MR. HISSAM:  Yes, sir.

```
 1              THE COURT:  All right.  Mr. Carr, can you file a
 2    memorandum in support of your request to enter an appearance on
 3    behalf of Stephen Herndon?
 4              MR. CARR:  Yes, Your Honor.
 5              THE COURT:  In fourteen days?
 6        All right.  Mr. DiPiero, can you comply with that period of
 7    time?
 8              MR. DIPIERO:  I can do it sooner, if you want.
 9              THE COURT:  Well, we're going to get into the holidays.
10    Most of these hearings are set -- I think Mr. Porter's is the
11    only one right now that is still set this year, so I think that's
12    plenty of time.  Then, so today is the 8th.  That's the 22nd.
13        Ms. Thomas, I don't want you to have to file something in
14    the middle of the holiday, so how about January 9th?
15              MS. THOMAS:  That's fine, Your Honor.
16              THE COURT:  All right.  So, if there's one on -- Mr.
17    Barnette's is on January 12th.  We may not be able to do that
18    then as a result of this.
19        Another question you need to address, Mr. Hissam, is this:
20    If I determine that you are disqualified from representing Mr.
21    Ellis, it appears to me that you've probably cultivated something
22    of an attorney-client relationship with him, at this point.  The
23    question then will be whether or not you can continue to
24    represent Mr. Barnette.
25              MR. HISSAM:  Yes, sir.  I'll certainly address that.
```

1          THE COURT:  You will need to address that and, Mr.

2    Carr, I suppose that's also an issue with you potentially, as

3    well.

4          MR. CARR:  Yes, Your Honor.

5          THE COURT:  All right.  So that's the schedule and I

6    will take a look at it and I will decide whether or not I want to

7    have another hearing at that point.

8        Anybody else have anything?

9          MS. THOMAS:  Yes, Your Honor.  I have a question.  I

10   was hoping for the Court's guidance.  A number of the individuals

11   are still cooperating with the government.  We've had ongoing

12   contact with a number of them.  I don't want to run into any

13   attorney-client representation issues.  We don't want to the have

14   unrepresented contacts, obviously.

15       Some of these individuals are providing valuable assistance

16   to the government.  Do we --

17          THE COURT:  I don't know what to tell you about that.

18   First thing comes to mind is, not my problem.

19          MS. THOMAS:  Yes, Your Honor.

20          THE COURT:  And I think that's -- I think that's

21   something you need to be really careful with, actually, and I

22   don't really know that I have anything to offer to you on that.

23   I'm trying to sort out my mess; you'll have to sort out your own.

24          MS. THOMAS:  Thank you, Your Honor.

25          THE COURT:  I mean, I don't -- what else could I do?

```
1                MS. THOMAS:  I know.  I understand.

2                THE COURT:  I don't know that there's anything else I

3      can do about it.

4                MS. THOMAS:  I think we might just have to wait.  We'll

5      --

6                THE COURT:  And, it's something that's occurred to me,

7      as Mr. Carr was talking this morning, I'm sure -- I'm aware that

8      some of the defendants are cooperating.  I'm aware -- however,

9      I'm guessing, speculating, that that might generate other cases

10     and I think the government would be well advised to keep all of

11     this mess in mind for any future cases that come out of this.

12               MS. THOMAS:  Yes, Your Honor.

13               THE COURT:  All right.  Anything else we need to take

14     up today?

15               MR. HISSAM:  Your Honor, if I may, briefly.  I just

16     don't want to bother the Court with an unnecessary motion.  One

17     of the two waivers that I've prepared to tender is set forth

18     within a fee agreement that has been redacted and I would propose

19     to tender that waiver in its redacted form so that it need not be

20     sealed.  I know the Courts are rather sensitive about sealing.

21               THE COURT:  I don't like to seal things.

22               MR. HISSAM:  Right.  And so I would prefer, with the

23     Court's permission, to tender it such that it's a fee agreement

24     with all of the material terms omitted except for the conflict

25     waiver and signature line.
```

```
1                    THE COURT:  Well, here's --
2                    MR. HISSAM:  I offer that, Your Honor, as an
3       alternative to sealing.
4                    THE COURT:  We'll here's my thought on that, and that
5       is that I'm a little hinky about things I don't know about in
6       this case, at this point, to use a highly technical term, and my
7       suggestion is that you tender the un-redacted agreement for
8       placement of the document on the docket under seal, and then put
9       the redacted version --
10                   MR. HISSAM:  Right.
11                   THE COURT:  -- on the docket with your brief not under
12      seal.
13                   MR. HISSAM:  Your Honor, I would, with the Court's
14      indulgence, ask one caveat to that.  Given that it does contain
15      -- the un-redacted version contains the material terms of the
16      representation, I would ask that it not just be under seal, but
17      ex parte, so the United States does not have access to what would
18      otherwise remain attorney-client privilege.
19                   THE COURT:  Any objection to that?
20                   MS. THOMAS:  I don't think so, Your Honor.  I'm really
21      -- the United States is mostly interested in the conflict
22      language.
23                   THE COURT:  I am, too, but, I mean --
24                   MS. THOMAS:  I have no objection to the other stuff
25      being redacted.
```

 1          THE COURT:  I probably shouldn't have used the word
 2  "hinky", but I'm leery of things I don't know in this case.
 3          MS. THOMAS:  Right.
 4          THE COURT:  So, the answer is, you have no objection?
 5          MS. THOMAS:  I have no objection.
 6          THE COURT:  Anybody else have an objection to that?
 7  Hearing none, that's the way we'll do it.
 8          MR. HISSAM:  Yes, Your Honor.
 9          THE COURT:  Anything else?
10          MR. HISSAM:  No, sir.
11          THE COURT:  All right.  Thank you.
12      (Proceedings concluded at 10:49 a.m., December 8, 2014.)
13
14  CERTIFICATION:
15      I, Ayme A. Cochran, Official Court Reporter, certify that
16  the foregoing is a correct transcript from the record of
17  proceedings in the matter of United States of America, Plaintiff
18  v. Stephen Herndon, Scott Ellis, Alvis Porter, Ronald Barnette &
19  David Herndon, Defendants, Criminal Action Nos. 2:14-cr-110,
20  2:14-cr-111, 2:14-cr-112, 2:14-cr-114 & 2:11-cr-215, as reported
21  on December 8, 2014.
22
23  s/Ayme A. Cochran, RMR, CRR                 December 15, 2014
24  Ayme A. Cochran, RMR, CRR                        DATE
25